IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDREW DRAKE, on behalf of
himself and others similarly situated,                    OPINION AND ORDER

                              Plaintiff,                  14-cv-216-bbc

              v.

AEROTEK, INC.,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff Andrew Drake filed this lawsuit under Wisconsin law (Wis. Stat. §§ 104.02 and 109.03 and Wis. Admin. Code §§ DWD 272.03 and 272.12) on behalf of himself and similarly situated individuals to recover overtime pay for work performed as recruiter trainees and then recruiters for defendant Aerotek, Inc.  Before the court are plaintiff's motion to certify two state-wide subclasses under Fed. R. Civ. P. 23, dkt. #51, and defendant's motion for leave to file a sur-reply in opposition to the motion.  Dkt. #93.  (Defendant has filed a motion for summary judgment with respect to plaintiff's individual claim for overtime pay for his work as a recruiter, but that motion will be addressed in a separate order.)  I have determined previously that jurisdiction is present under the Class Action Fairness Act, 28 U.S.C. § 1332(d).  Sept. 28, 2015 order, dkt. #114.

Plaintiff claims that defendant violated state law by (1) not paying its trainees for overtime they worked each week between March 21, 2012 and March 31, 2014; and 2)

1

classifying recruiters as exempt from overtime under Wisconsin law and not compensating them for more than 40 hours a week from March 21, 2012 to the present.  He seeks to certify a subclass with respect to each claim.  Defendant opposes plaintiff's motion for class certification primarily on the ground that plaintiff lacks evidence that is common to the class rather than specific to individual members of the subclasses.

"On issues affecting class certification . . . a court may not simply assume the truth of the matters as asserted by the plaintiff.  If there are material factual disputes, the court must 'receive evidence . . . and resolve the disputes before deciding whether to certify the class." Messner v. Northshore University Health System, 669 F.3d 802, 811 (7th Cir. 2012) (quoting Szabo v. Bridgeport Machines, Inc., 249 F.3d 672, 676 (7th Cir. 2001)).  Plaintiff has the burden of showing that his proposed subclasses satisfy the requirements of Fed. R. Civ. P. 23 and proving each disputed requirement by a preponderance of evidence.  Id. After reviewing the evidence submitted by both parties, I conclude that the question of class certification in this case may be decided on the parties' written submissions without holding an evidentiary hearing.  A close review of those submissions shows that plaintiff has failed to meet his burden with respect to either of his proposed subclasses.

Plaintiff contends that the trainee overtime claims can be resolved on a class-wide basis because defendant had a national practice of requiring trainees to work overtime but not paying them for it.  In support of this contention, plaintiff submits (1) testimony from former trainees that they worked overtime hours for which they were not compensated; (2) an email from defendant's finance department about keeping costs down; and an "ideal"

schedule distributed in some of the Wisconsin offices. However, defendant has adduced unrefuted evidence that it has a written policy that employees must record and be paid for any overtime they worked and that different trainees were told different things by their supervisors with respect to recording and receiving compensation for overtime hours. In the absence of other evidence of a uniform policy or practice of requiring off-the-clock work, it appears that it was the discretionary (and incorrect) decision of individual supervisors to tell trainees that they must work but could not record overtime hours. In this circumstance, it would be necessary for the court to consider the individual circumstances of each trainee before determining whether that trainee is entitled to overtime payments, which means that liability could not be determined on a class-wide basis. Accordingly, I must deny plaintiff's motion for class certification with respect to the trainee subclass.

Plaintiff acknowledges that the state exempts certain employees performing administrative functions from the Wisconsin Wage Payment and Collection Law, Wis. Admin. Code ch. DWD 274.04, including "[p]ersons whose primary duty consists of administrative, executive or professional work." § DWD 274.04(1)(b). He contends, however, that a recruiter subclass is warranted because all recruiters have the same primary job duty, which does not meet the first criterion of the state administrative exemption. He has adduced some evidence that three types of recruiters have the same job duties and that these recruiters would not be eligible for the exemption, but he has failed to show that this is true for all 13 types of recruiters in his proposed class. Because defendant has presented evidence that other types of recruiters perform different job duties, including more

3

traditional administrative tasks, it cannot be assumed that all recruiters perform the same primary job duties in the same manner. Although plaintiff contends generally that these administrative tasks are insignificant, he has adduced no evidence to support this view or even explained the bases for his contention. Accordingly, I conclude that plaintiff has failed to show that the recruiter misclassification claim is capable of class-wide analysis. Because it may be possible for plaintiff to fix the problem by redefining the class or presenting another plan for class certification, I will give him one more opportunity to file a renewed request for certification of the recruiter class.

In determining whether the subclasses should be certified, I have considered the allegations in the second amended complaint and the affidavits and depositions that the parties have submitted. Sharpe v. APAC Customer Services, Inc., 2010 WL 135168, *1 (W.D. Wis. Jan. 11, 2010); Sjoblom v. Charter Communications, LLC, 571 F. Supp. 2d 961, 964 (W.D. Wis. 2008).


BACKGROUND

Defendant Aerotek, Inc. is an international staffing company that provides technical, professional and industrial recruiting and staffing services to a wide range of customers. Defendant has five offices in Wisconsin: Appleton, Madison, Milwaukee North, Milwaukee South and Racine. Weiss decl., dkt. #78 at ¶ 3. Each office is overseen by a director of business operations who supervises a number of account managers. The account managers supervise a small number of recruiters (usually one or two). Id. at ¶ 9. The Wisconsin

offices have six divisions, including scientific, contract engineering, energy services, environmental and engineering, commercial services and professional services. The director of business operations determines what divisions will be housed in a particular office and the number of staff necessary for each division. Id. at ¶¶ 5-6, 9. Some of the Wisconsin offices have subdivisions such as government services and architecture. Dkt. #69 at ¶¶ 2-3, #79 at ¶¶ 2, 6 and #82 at ¶¶ 2-3.

During the time relevant to this lawsuit, the Madison and Appleton offices each had two directors: Brooks Berg was the Madison director from March 21, 2012 until mid-2012; Tyler Ellis was the Madison director from October 2012 to the present; Randall Ingraham was the Appleton director from March 21, 2012 until spring 2014; and John Melsha became the Appleton director in July 2014. Brent Erickson has been the director of the Milwaukee and Racine offices throughout the relevant time period. Dkt. #44 at 5, #45 at 6, #46 at 5, #47 at 5 and #48 at 5.

On January 30, 2012, plaintiff Andrew Drake began a 13-week training period in the contract engineering division of defendant's Madison office. Drake decl., dkt. #53 at ¶ 2. When he completed the training period, he became a salaried recruiter in the contract engineering division of the Madison office and worked for defendant until January 2013. Id. at ¶ 22, 40; Drake dep., dkt. #59 at 13.

A.  Trainees

When defendant hires a new employee, that employee enters a 13-week training program as a "trainee."  Defendant pays its trainees an hourly wage and classifies them as nonexempt.  Weiss dep., dkt. #50 at 48; Weiss decl., dkt. #78 at ¶¶ 10, 15.  Several of defendant's corporate, finance and management employees testified that defendant has always required trainees to record and be paid for all overtime hours worked.  Dkt. #45 at 42-43, 49 and 143; dkt. #46 at 33, 39 and 49; dkt. #47 at 169-70; dkt. #48 at 51; dkt. #49 at 21 and 71; dkt. #50 at 138-40 and dkt. #67 at ¶ 4.  The directors of business operations are responsible for communicating this policy to trainees and have the discretion to approve overtime hours for trainees.  Dkt. #45 at 45; dkt. #46 at 39; dkt.#48 at 42; dkt. #49 at 21-25.  Defendant gave directors of business operations a written document entitled "Recruiter 13 Week Training Period, Frequently Asked Questions." Dkt. #49 at 46-48.  This document states that "all new recruiters are allowed to work overtime, although it is totally at the DBO's discretion, and overtime should be allowed only under critical circumstances. Importantly, if overtime is worked, it **must** be recorded (see below) and paid."  Dkt. #88, exh. 9 at 1 (emphasis and parenthetical in original).

The finance department sometimes instructed the directors of business operations to limit the amount of hours that trainees work.  Dkt. #45 at 44-45; dkt. #49 at 21-22.  For example, on March 13, 2012, then Executive Director of Finance Stephen Forman sent an email to defendant's directors of finance, stating that:

> Looking at performance versus OT [overtime] costs last year, there isn't a correlation of more OT driving higher performance.

> I would encourage you to revisit this with your RVPs/DBOs [regional vice presidents and directors of business operations] as we could realize cost savings by simply putting steps in [sic] to manage a work schedule for the Recruiter Trainees.  With any message around this, we always need to emphasize the fact that we must pay for any OT.  The key is to lower the hours of OT actually worked.

Dkt. #58, exh. A.  See also Spears dep., dkt. #49 at 42-43 (identifying sender and recipients).

On March 31, 2014, defendant changed its overtime policy and required trainees to work 48 hours a week and increased their annual earnings from $30,000 to $33,000 a year, based on an hourly rate of $12.21 and an overtime hourly rate of $18.31.  Dkt. #45 at 44-45; dkt. #58, exhs. D and L.  After the policy change, the number of overtime hours worked by trainees in all of the Wisconsin offices increased significantly from 2013 to 2014.  For example, Appleton trainees reported about 14 hours of overtime in 2013 and up to 902 hours in 2014, and Madison trainees reported about 20 hours in 2013 and up to 1120 hours in 2014.  Dkt. #52 at 25-26; dkt. #58 at ¶¶ 25-29.

Plaintiff and other former trainees have submitted declarations in which they state that as trainees, they regularly worked overtime hours for which they were not compensated:

- Plaintiff states that all of the account managers in the Madison office, including Eric Saari, told him that he was supposed to work more than 40 hours a week but not record the time.  Dkt. #53 at ¶ 15-16.  He understood that this direction came from director Brooks Berg.  Id. Plaintiff states that he worked well over 40 hours a week during his training period, including at least three lunch hours a week and taking calls during break times and on the weekends.  Id. at ¶¶ 13, 18-19.  At the end of his training period, plaintiff recorded two hours of overtime, and Saari instructed him not to do that again.  Id. at ¶ 21.

- Nick Phillips completed his training in the Appleton office on March 10, 2014 and then worked as a recruiter until November 14, 2014.  As a trainee he usually worked from 7:00 a.m. to 6:30 p.m. but was only paid for 40 hours of work a week.  Dkt. #54.

- Brett Saari worked in the Appleton office from March 2013 to May 2014 as a trainee and then a recruiter.  During his training period, the director of business operations told him that he would not receive overtime pay.  Although Saari says that he did not record the five to 10 overtime hours that he usually worked as a trainee, he did record and get paid for some overtime hours that he worked in the beginning of his training period.  Dkt. #55 at 1.

- Jonathan Sare worked as a trainee in the North Milwaukee office from June 2 to September 3, 2013.  His account manager, Jesse Kerns, told him that he could record only 40 hours a week even if he worked more hours.  Although the director of business operations would tell Sare and his coworkers to go home, they understood that they were supposed to stay and finish their work.  Dkt. #56.

- Lars Schultz worked as a trainee in the Madison office in 2008, before the relevant class period in this case.  He says that his account manager told him that trainees would not be paid time and a half for any overtime hours they worked.  Dkt. #57.  However, Schultz testified at his deposition that in 2012-13, he observed account managers telling trainees that if they worked overtime, they had to record all of those hours.  Dkt. #61 at 28-29.  He also testified that in 2012 and 2013, he and other account managers made sure trainees worked only 40 hours a week by sending them home early on Fridays if necessary.  Id. at 28.

Other former trainees (some of whom did not work as trainees during the class period) stated under oath that they were instructed to record all of their regular and overtime hours and not work "off-the-clock."  Jeff Bailitz decl., dkt. #68 at ¶¶ 7-8; William Dictus decl., dkt. #73 at ¶ 6; Allie Langkau decl., dkt. #76 at ¶ 5; Amie Osten decl., dkt. #80 at ¶¶ 4-5; Weston Patrick decl., dkt. #81 at ¶ 4; Albert Simons decl., dkt. #83 at ¶ 6; Catherine Snow decl., dkt. #84 at ¶ 6; Mark Webster decl., dkt. #86 at ¶¶ 4 and 6.

In February 2012, Aarati Doddanna, an Aerotek Employee Relations Manager, learned that Eric Saari allowed certain trainees to work more than 40 hours a week but had told them to record only 40 hours on their timesheets. Doddanna decl., dkt. #67 at ¶ 3; Eric Saari dep., dkt. #60 at 9. Doddanna conducted an investigation, which confirmed that Saari had incorrectly communicated Aerotek's time-recording policy to certain trainees before March 2012 (the first month of the trainee class period). Dkt. #67 at ¶ 3. Doddanna warned Saari, telling him that (1) trainees were required to record all hours worked on their timesheets so that defendant could pay them for those hours; (2) Saari was to meet individually with trainees to make sure that they understood defendant's expectation that they would accurately and completely report all hours worked; (3) it was Saari's responsibility to manage trainees so that they did not work more than 40 hours a week, but that if they did, they were to record all hours worked so that defendant could pay them for their overtime; and (4) trainees who attended work-related lunches needed to record those hours on their timesheets as time worked. Dkt. #67 at ¶ 6; dkt. #60 at 12-14, 16-17. Doddanna also determined which trainees had failed to record (and thus be paid for) all of their hours, and defendant paid those individuals. Dkt. #67 at ¶¶ 7-9 and exhs. A-D. Plaintiff was not paid because Doddanna determined that he had not worked any overtime that was not recorded on his time sheets. Id. at ¶¶ 5, 9.

Hunter Burghy joined defendant's training program in the Madison office in September 2013. Eric Saari was the account manager for both Burghy and plaintiff. However, Saari took measures to adjust Burghy's schedule so that he did not work more

than 40 hours a week.  Saari also told Burghy to record all of the time he worked, including overtime, and not to falsify his time records.  Dkt. #70 at ¶¶ 2 and 5.  As a trainee, Matthew Tuttle received similar instructions from Saari in early 2013.  Dkt. #85 at ¶¶ 1 and 4.

### B.  Recruiters

Plaintiff is seeking class certification for 13 different recruiter positions:  assigned recruiter, recruiter, on-premise recruiter, recruiter II, senior recruiter, professional recruiter, senior professional recruiter, account recruiting manager, account recruiting manager II, professional account recruiting manager, senior account recruiting manager, senior professional account recruiting manager and strategic delivery recruiter.  Dkt. #72 at ¶4.  Some of defendant's compensation documents also mention an "executive professional recruiter" and show that employees advance into different positions based on length of employment and performance—the amount they earn for defendant.  Dkt. #58, exhs. C and D.  Although recruiters are assigned to a particular division, they sometimes work for other divisions (which is called "cross divisional recruiting") if there is a staffing need.  Dkt. #44 at 20; dkt. #45 at 56, 154; dkt. #46 at 47-48; dkt. #47 at 36; dkt. #50 at 58-59; dkt. #60 at 25.  Defendant does not provide recruiters formal or specialized training for cross divisional recruiting.  Id.

Defendant classifies all of the recruiter positions as exempt.  Each recruiter is paid a salary.  Although a recruiter's pay may vary by experience, performance and the number of people the recruiter is supervising, recruiters are paid the same base salary and are subject

to the same commission structure across divisions.  Dkt. #44 at 23; dkt. #45 at 58-59; dkt. #49 at 38-39.

Recruiters have no division-specific job descriptions.  Dkt. #44 at 16; dkt. #46 at 63; dkt. #60 at 23.  On May 30, 2013, defendant's human resources department approved one job description for recruiter trainee and another for assigned recruiter, recruiter II and professional recruiter, but the job summary and essential functions were the same on each document.  The position descriptions specified that none of these positions had supervisory or management responsibilities.  On September 27, 2013, human resources approved a combined job description for the titles of recruiter trainee, assigned recruiter, recruiter II and professional recruiter.  The document identifies the same job summary and essential functions for all four positions and states that none of the positions had any direct supervisory or management responsibilities.  Dkt. #52 at 9-11.

Tyler Ellis, the Madison office director, agrees that trainees, assigned recruiters and recruiter IIs were expected to perform the following essential functions from their job description:  (1) identify qualified candidates through various creative recruiting tools; (2) complete client-specific pre-employment processes, including reference checks and background and drug tests; (3) work with account managers to identify top accounts, target skill sets and key market segments; (4) communicate effectively with others in order to create a productive and diverse environment; (5) share best practices and provide accurate, thorough documentation on contract employees in applicant tracking systems or other documentation tools; and (6) maintain relationships with industry contacts to provide

11

customer service, gain industry knowledge and get referrals and sales leads.  Dkt. #45 at 90-100.

Ellis also testified that regardless the division in which they worked, recruiters were expected or at least encouraged to strive to ensure Aerotek's reputation for providing the right candidate the first time; utilize an internal database to identify potential candidates; develop creative recruiting resources to attract qualified professionals interested in contract employment, contract-to-hire employment and direct placement employment; to "network" outside the office by attending career fairs, professional association meetings, calling on technical schools and other placement services; to speak with and interview all candidates before putting them to work; to present job opportunities to qualified candidates; to negotiate contract terms on some occasions; to prepare résumés for clients at times and coach candidates through the client interview process; depending on the recruiter, client and account manager's schedule, to meet contractors on the first day of their assignment at the client site; to go on lunch meetings with their contractors to build relationships; and visit customer sites if they were nearby.  Dkt. #45 at 108-20.  However, Ellis emphasized throughout his testimony that whether, to what extent and how recruiters performed these tasks often depends on a number of variables, such as the experience and needs of the particular recruiter, account manager and customer.  Id. at 90-120.

Other witnesses also confirmed the differences in how recruiters performed their tasks.  Dkt. #65 at 47-50; dkt. #88 at exh. #21.  In addition, individuals who worked as recruiters in various offices and divisions testified that they performed the following tasks to varying degrees, depending on their job title, location, level of experience and supervisor:

interviewing and selecting candidates independently; interviewing  client hiring managers; negotiating wages and benefits with candidates or clients; negotiating bill rates with clients; supervise other recruiters; engaging in business development; training other recruiters; and maintaining client contact.  Id.  For example, an "account recruiting manager" performs a lot of recruiting but also negotiates bill rates with their clients at contract renewal time, dkt. #61 at 103-04; dkt. #66 at ¶ 24, and a "recruiter lead" trains new employees on the basics of recruiting.  Dkt. #66 at ¶ 3; dkt. #73 at ¶ 26.  In general, the number of candidates, the length of the recruiting cycle, the need for supervision and the amount of discretion exercised varied by recruiter.  Dkt. #65 at 47-50; dkt. #88 at exh. #21.

## C.  Rip Zone Document

A "Rip Zone" document is a suggested daily schedule or "model operating rhythm" for a recruiter used in some of defendant's offices.  The directors of business operations created different versions of these schedules and some offices did not use this document. Dkt. #49 at 67; dkt. #47 at 149; dkt. #45 at 135-36.  Tyler Ellis introduced one version in the Madison office sometime after he became the director of business operations in October 2012, but he is not sure when he created the document or distributed it to the account managers and recruiters.  Dkt. #45 at 6, 136.  Trainees in the Madison office often had a copy on their desk.  Id.  The document that Ellis created showed the recruiter's day starting at 7:30 a.m. and ending at 5:30 p.m. with one hour for lunch.  Dkt. #58, exh. M. In late 2013 or early 2014, Brent Erickson distributed Ellis's Rip Zone document to the

Milwaukee and Racine account managers and told them it was a "loose guideline" and "teaching tool."  Dkt. #46 at 6, 55-57.

## OPINION

Plaintiff seeks to certify his state law claims under Fed. R. Civ. P. 23, which imposes four requirements that all class actions must satisfy:  (1) numerosity, that "the class is so numerous that joinder of all members is impracticable"; (2) commonality, that "there are questions of law or fact common to the class"; (3) typicality, that "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) adequacy, that "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  In addition, plaintiff must meet the requirements of at least one of the types of class actions listed in Rule 23(b).  Plaintiff relies solely on Rule 23(b)(3), which requires him to show that common questions of law or fact "predominate" over individual questions and that a class action is "superior" to other methods of adjudication.  Smith v. Family Video Movie Club, Inc., 2013 WL 1628176, at *11 (N.D. Ill. Apr. 15, 2013) (citing Messner v. Northshore University Health System, 669 F.3d 802, 814 (7th Cir. 2012) (predominance requirement satisfied when common questions represent significant aspect of case and can be resolved with common evidence for all class members in single adjudication).  Under Rule 23(b)(3), the ultimate question is whether the proposed class is "sufficiently cohesive to warrant adjudication by representation."  Amchem Products, Inc. v. Windsor, 521 U.S. 591, 623 (1997).

Although the requirements of Rule 23(a) and (b)(3) are different, many of them tend to overlap.  E.g., Telephone Company of the Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge."); Messner, 669 F.3d at 814 ("While similar to Rule 23(a)'s requirements for typicality and commonality, the predominance criterion [of Rule 23(b)(3)] is far more demanding.") (internal quotations omitted).  To determine whether the liability issues would require individual fact-intensive determinations or whether they are subject to class-wide proof, the court examines such factors as the substantive elements of plaintiff's claims, the proof necessary for those elements and the manageability of trial on those issues.  Farmer v. DirectSat USA, LLC, 08 C 3962, 2010 WL 3927640, *22 (N.D. Ill. Oct. 4, 2010).

Plaintiff seeks to certify the following two subclasses:  (1) individuals who worked for defendant in Wisconsin during a training period who engage or have engaged in the tasks and activities of a recruiter trainee without receiving proper compensation, from March 21, 2012, through March 31, 2014; and (2) individuals who completed the training period and worked for defendant as recruiters in Wisconsin from March 21, 2012 to the present and who were classified as "exempt" under state law.  Defendant contends that plaintiff cannot satisfy the commonality, typicality, predominance or superiority requirements of Rule 23(a) and (b) for either the trainee or recruiter subclass because there are too many material factual differences among the employees' claims.  (Defendant does not challenge the numerosity or adequacy requirements.)  I agree with defendant that at least some of the

15

differences it identifies with respect to the trainee and recruiter subclasses show that plaintiff's claims do not meet that standard.

A.   Trainee Subclass

Plaintiff contends that defendant had "a uniform set of national policies that applied to every office in Wisconsin," prohibiting trainees from working overtime but at the same time required them to work more than 48 hours a week.  He also argues that "the existence of overtime policies and whether the policies were enforced is capable of class treatment" because every class member was treated the same.  In support of his contentions, plaintiff relies on testimony from former trainees that they worked overtime hours for which they were not compensated, an email from defendant's finance department about keeping costs down and a Rip Zone schedule.  However, this evidence fails to show that defendant had a national policy or practice of requiring trainees to work overtime but not paying them for it.  It also does not establish that all class members were given similar instructions or treated the same with respect to overtime hours.

Defendant admits that its finance department occasionally asked the directors of business operations to keep overtime costs down. Executive Director of Finance, Stephen Forman, encouraged this practice in his March 2012 email, but he did not prohibit directors from approving overtime for trainees or state that trainees would not be paid for any overtime hours they worked.  Instead, he asked directors to reduce costs by managing the trainees' work schedules.  Notably, Forman emphasized that the key was to reduce the

number of overtime hours actually worked because defendant must pay for any overtime. Dkt. #58, exh. A.  Nothing in the text of the email states or implies that trainees should not record their overtime hours, and other written guidance from defendant (in the form of responses to "frequently asked questions") told directors that if overtime is worked, it must be recorded and paid.

Although I agree that the Rip Zone schedule created by Ellis for the Madison office suggests that he expected trainees to work nine hours a day with one unpaid for lunch, plaintiff has no evidence that this schedule was enforced by all of the account managers in the Madison office, let alone by the account managers in all of the Wisconsin offices.  Ellis created the document as a guide for his staff in Madison.   In his reply brief, plaintiff contends that the Rip Zone document was an expectation and followed by trainees, but the only evidence he cites in support is his own declaration in which he states that he worked more than 48 hours a week.  Dkt. #53 at ¶ 9.  Plaintiff points out that Brent Erickson showed this document to his Milwaukee and Racine staff, but he cites no evidence to support a finding that they used it or that Erickson expected them to follow it.

In his reply brief, plaintiff states for the first time that Brett Saari also saw some sort of Rip Zone schedule posted in the Appleton office.  However, Saari explains that even though the document was posted in the office, it "was not expected.  It was kind of suggested."  Dkt. #63 at 128.  More important, even if the Rip Zone schedule qualifies as a "uniform policy" requiring trainees to work five to 10 hours of overtime a week, nothing

in the document suggests that trainees should not record their overtime hours or that they would not be paid for those hours.

Plaintiff notes that when defendant changed its policy in March 2014 and allowed trainees to work eight hours of overtime a week, the number of hours that the trainees worked in the Wisconsin offices skyrocketed.  He contends that this is proof that trainees were working the extra hours prior to March 2014 but just not recording the time. Defendant argues in response that it cannot be inferred from this evidence that trainees always worked a large number of overtime hours but did not report them.  Rather, it says, the more likely scenario is that the number of overtime hours increased because defendant told trainees that they were expected to work 48 instead of 40 hours a week and would be paid for those hours.

The crucial question not answered by Stephen Forman's email or the Rip Zone document is *why* plaintiff and other trainees would choose to work overtime without reporting it.  Plaintiff suggests that even though defendant outwardly required the recording and payment of overtime, its managers had an unwritten practice of forcing trainees to work "off-the-clock."  Gomez v. PNC Bank, National Association, 306 F.R.D. 156, 166-67 (N.D. Ill. 2014) aff'd sub nom. Bell v. PNC Bank, National Association, 800 F.3d 360 (7th Cir. 2015) (similar testimony from employees in six different bank branches was evidence of unwritten policy and satisfied commonality and predominance requirements).  As proof of this practice, plaintiff submits his own declaration and declarations from other former trainees who say that they worked overtime hours for which they were not compensated.

18

However, unlike in <u>Gomez</u> and other district court cases cited by plaintiff, the declarations and other trainee statements submitted by plaintiff vary significantly with respect to the instructions they received and their understanding of how overtime would be compensated.

Plaintiff says that Eric Saari told him to work overtime but not record it. However, defendant submits evidence, which plaintiff has not refuted, that Saari gave these instructions in error for a limited period in 2012 and was corrected for doing so. Two other trainees who worked for Saari testified that by 2013, Saari correctly informed them to record all of the time they worked, including overtime, and not falsify their time records. Although former trainee Jonathan Sare says that he was told by an Appleton account manager to work overtime but not record it, Lars Schultz, another Appleton trainee, states only that he was told that he would not be paid for any overtime he worked. Schultz did not state that he was forced to work but not record overtime hours. (Both Phillips and Brett Saari made similarly vague statements in their declarations. However, plaintiff notes for the first time in his reply brief that they testified at their depositions that their supervisors told them not to record their overtime hours. Dkt. #92 at 6-7.)

In fact, Schultz testified that he observed account managers telling trainees in 2012-13 that if they worked overtime, they had to record all of those hours. He also stated that he and other account managers managed trainees to work only 40 hours a week by sending them home early on Fridays if necessary. Although plaintiff takes issue in his reply brief with defendant's characterization of other portions of Schultz's testimony, he does not

dispute these statements.  Therefore, it seems that whether a trainee felt pressure to work overtime and not record it depended on when, where and for whom he worked.

Further, because some employees were paid for the overtime they worked during certain weeks, it appears that the decision to pay overtime was left to the discretion of the directors and varied depending on the circumstances.  For example, both plaintiff and Brett Saari stated that they were paid for some overtime hours that they recorded as trainees.  If so, it would be necessary to review each employee's individual circumstances to determine the extent of defendant's liability. This is the antithesis of a class action, which is designed to determine issues common to all of the class members.  Harper v. Sheriff of Cook County, 581 F.3d 511, 514-15 (7th Cir. 2009) ("[C]ommon issues do not predominate over individual issues, making this case inappropriate for class disposition," if "[l]iability . . . would need to be determined on an individual basis."); Pastor v. State Farm Mutual Automobile Insurance Co., 487 F.3d 1042, 1047 (7th Cir. 2007) ("[W]hen a separate evidentiary hearing is required for each class member's claim, the aggregate expense may, if each claim is very small, swamp the benefits of class-action treatment.").

Given the absence of proof of a company-wide policy or directive and the wide variation in the class members' experiences, the common questions central to plaintiff's trainee overtime claim cannot be resolved on a class-wide basis.  Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2554-55 (2011) (Rule 23(a)(2) commonality requirement not met because "[r]espondents have not identified a common mode of exercising discretion [over employment matters] that pervades the entire company"); Bolden v. Walsh Construction

20

Co., 688 F.3d 893, 896 (7th Cir. 2012) ("[W]hen multiple managers exercise independent discretion, conditions at different stores (or sites) do not present a common question" under Rule 23(a)(2)); Vang v. Kohler Co., 488 F. App'x 146, 147 (7th Cir. 2012) (unpublished) (particular supervisors' regular departure from corporate policy created variable circumstances that do not present common question); Hawkins v. Alorica, Inc., 287 F.R.D. 431, 444 (S.D. Ind. 2012) (plaintiff's evidence does not establish policy or practice of requiring employees to work without compensation; "[a]t best, that evidence shows that certain supervisors may have instructed their charges along those lines."); York v. Starbucks Corp., 2011 WL 8199987, *26 (C.D. Cal. Nov. 23, 2011) (commonality requirement not met because plaintiff conceded that "violations resulted from individual action and not a corporate-wide policy or practice.").  For the same reasons, plaintiff cannot show that his claim is typical of those of the class members or that common questions of law and fact predominate.   Smith Family Video, 2013 WL 1628176 at *11 (location and manager-dependent nature of plaintiffs' claims destroys predominance); Strait v. Belcan Engineering Group, Inc., 911 F. Supp. 2d 709, 734 (N.D. Ill. 2012) (finding plaintiffs not able to prove claims using evidence common to class because individualized inquiries required to determine plaintiffs' compensation experiences and each manager's practices with respect to paycheck deductions); Kenny v. Supercuts, Inc., 252 F.R.D. 641, 646 (N.D. Cal. 2008) (denying class certification because individual issues would predominate as court would need to determine why each class member did not clock out for meal break on any particular day); Salazar v. Avis Budget Group, Inc., 251 F.R.D. 529, 534 (S.D. Cal. 2008)

21

(denying class certification because individual issues would predominate in determining whether defendants forced plaintiffs to forgo missed meal periods).

Although plaintiff cites a few cases in which district courts have approved a collective action under the Fair Labor Standards Act based on an unwritten policy of not recording or paying for overtime, I am not persuaded that the evidence in this case sufficiently establishes such a policy on the part of defendant under Rule 23. As defendant points out, courts generally view the standard for granting conditional certification under the Fair Labor Standards Act as less stringent than the standard for granting class certification under Rule 23. Genesis Healthcare Corp. v. Symczyk, __ U.S. __, 133 S. Ct. 1523, 1532 (2013) ("Whatever significance "conditional certification" may have in § 216(b) proceedings, it is not tantamount to class certification under Rule 23."); Smith v. Family Video Movie Club, Inc., 2012 WL 580775, at *5 (N.D. Ill. Feb. 22, 2012); Driver v. AppleIllinois, LLC, 265 F.R.D. 293, 316 n.20 (N.D. Ill. 2010). In addition, unlike in this case, the courts in most of the cases cited by plaintiff found evidence of a consistent or corporate practice from which they could infer an unwritten policy of not recording or paying for overtime hours. Butler v. DirectSAT USA, LLC, 47 F. Supp. 3d 300, 311 (D. Md. 2014) (evidence demonstrated that plaintiffs permitted to record start time only as time they arrived at first job site and end time as time they completed last job, despite requirements to perform compensable work before and after those times); LaFleur v. Dollar Tree Stores, Inc., 30 F. Supp. 3d 463, 471 (E.D. Va. 2014) (noting "combination of practices were used to accomplish unpaid off-the-clock work, including *corporate* control of local labor budgets and recording within the

22

COMPASS timekeeping system.") (emphasis added); <u>Jancich v. Stonegate Mortgage Corp.</u>, 2014 WL 1011480, at *3 (D. Kan. Mar. 17, 2014) ("Although [loan officers'] geographic locations and supervisors may vary, it appears that the same standard—whether it be the pay plan in effect or the direction to record no more than forty hours in Timeforce—was consistent between location."). <u>Cf.</u>, <u>Driver</u>, 265 F.R.D. at 316 (denying class certification because no proof of central, corporate policy establishing or encouraging time-altering or "off the clock" work, even though evidence suggested such practices in individual restaurants).

In sum, because plaintiff has failed to show that his trainee claim meets the commonality, typicality or predominance requirements of Rule 23, his motion to certify the trainee subclass will be denied.

## B.  Recruiter Subclass

Plaintiff contends that even though recruiters and trainees performed the same types of tasks and had the same job description, defendant classified the recruiters and not the trainees as exempt from overtime pay.  He argues that common issues predominate the misclassification claim because defendant had a uniform, corporate policy of classifying recruiters as exempt from overtime pay under Wis. Admin. Code § DWD 274.04(1)(b), which applies to "administrative" employees who meet five task-related criteria.  In particular, plaintiff contends that recruiters do not meet the first criterion because their "primary duty" does not "consist[] of the performance of office or nonmanual work directly

23

related to management policies or general business operations of their employer or their employer's customers." § 274.04(1)(b)(1).

The parties debate the meaning and applicability of the exemption. For example, plaintiff devotes a substantial portion of his argument to the question whether administrative decisions by the Wisconsin Department of Workforce Development are entitled to deference and whether Wisconsin's exemption is similar to the old or new version of the federal exemption. At this stage of the proceedings, it is not necessary to determine how the administrative exemption should be interpreted or whether plaintiff or members of the proposed class meet the exemption criteria. The crucial question is whether the potential class members' experiences are so similar that the court could apply the exemption criteria on a class-wide basis.

Defendant notes two unsuccessful attempts to certify similar misclassification claims involving Aerotek recruiters. Delodder v. Aerotek Inc., 471 F. App'x 804, 806 (9th Cir. 2012) (affirming denial of class certification under Rule 23(b)(3) because evidence showed variation in recruiters' candidate sourcing techniques, interview styles, authority to recommend candidates and relationship with supervisors, all of which were relevant to state law exemption); Andrade v. Aerotek, Inc., 2009 WL 2757099, at *3 (D. Md. Aug. 26, 2009) (denying conditional certification under Fair Labor Standards Act because type and number of candidates recruited, degree of hiring and firing authority, degree of authority to negotiate wages and benefits and amount of direct client contact varied from division to division and recruiter to recruiter). It contends that, as in Delodder and Andrade, the job duties, level

24

of discretion and need for supervision of Wisconsin recruiters varied by office, division and individual, and that these differences prevent class-wide application of the administrative exemption criteria.  § 274.04(1)(b)(2) (administrative employees customarily and regularly exercise discretion and independent judgment); § 274.04(1)(b)(3) (administrative employees perform specialized or technical work or execute special assignments and tasks under only general supervision).

Plaintiff contends that the differences in the amount of discretion and independence exercised by recruiters are irrelevant because regardless what a recruiter's job title, supervisor or location was, every recruiter had the primary duty of securing quality candidates for defendant's clients, a task that is not directly related to the "general business operations" of defendant or its customers.  In other words, plaintiff believes that none of the proposed class members can satisfy the first criterion of the administrative exemption, so it is unnecessary to consider defendant's arguments related to the other criteria.

As proof that recruiters share a common primary duty, plaintiff cites the following:

- Christopher Weiss, the executive director of regional operations, testified that defendant matches up the best candidates with the best clients and agreed that a *trainee's* primary duty is finding good candidates for his or her clients.  Dkt. #50 at 5, 10-13, 53-54.

- Plaintiff stated that defendant is a recruiting firm that solicits qualified employee candidates for employers.  Dkt. #53 at ¶ 3.

- Randall Ingraham, director of the Appleton office, testified that the job function of a recruiter is to place people with clients.  Dkt. #47 at 125-26.

- Tyler Ellis, director of the Madison office, agreed that trainees, assigned recruiters and recruiter IIs were expected to perform the same essential functions from their job description.  Dkt. #45 at 90-120.  He also stated

25

that the mission of the Madison office was to put contractors to work at the customer's place of business and that regardless of division, recruiters are responsible for identifying, interviewing and presenting qualified candidates for positions.  Id. at 40, 88.

- The job summary in the position description for trainees, assigned recruiters, recruiter IIs and professional recruiters states that the recruiter is responsible for identifying, interviewing and presenting qualified candidates for contract and permanent positions.  Dkt. #58, exhs. E-G.

Although some of plaintiff's evidence suggests that trainees, assigned recruiters, recruiter IIs and professional recruiters may have the same primary job function, none establishes that all 13 types of recruiters across defendant's Wisconsin offices had the same primary duty. In fact, defendant has produced evidence that at least higher-level recruiters (such as account recruiting manager and recruiting leads) performed what seem to be more traditional administrative tasks—negotiating billing rates with clients, training and supervising other recruiters and engaging in business development.

Plaintiff faces another problem.  The first criterion under § DWD 274.04(1)(b), setting out the requirements for an exemption from the requirements of Ch. DWD 274 requires the job duty in question to be "primary."  The fourth criterion says that no more than 20 percent of the employee's weekly hours may be devoted to activities not directly and closely related to the exempt activities.  None of the evidence cited by either party in their briefs explains how much time recruiters may spend on the types of administrative tasks identified by defendant.  My independent review of some of the evidence suggests that some of these activities may be sporadic, e.g., dkt. #61 at 104 (Schultz usually negotiated billing rates once a year at renewal time), but plaintiff has not developed such an argument or

26

supported it with evidence.  Instead, he points out that the directors of business operations believe that it is impossible to break down a recruiter's duties based on weekly percentages and argues generally, without citing any factual support, that a recruiter's administrative work is negligible and all recruiters spend at least 80 percent of their time "finding qualified candidates for defendant's clients."  Dkt. #52 at 56-57.  Plaintiff refers briefly to the Rip Zone document in an effort to show how recruiters spend their time.  However, for the reasons explained previously, he has adduced little evidence that this schedule was enforced in all of the Wisconsin offices in the same manner.  Further, recruiters have testified that they performed tasks not listed on the Rip Zone document.

In sum, I agree with defendant that plaintiff has failed to show that his recruiter claim is appropriate for class certification.  Although plaintiff has presented some evidence that assigned recruiters, recruiter IIs and professional recruiters have common, primary job duties, he has failed to show that other types of recruiters share these primary duties or explained how the court might determine on a class-wide basis how much time the recruiters spend performing any particular duty.  Regardless whether one views the problem as the absence of a common question of law or fact, that plaintiff lacks claims typical of the subclass, that common questions do not predominate or that a class action is not a superior method of adjudication, plaintiff has not met his burden with respect to his proposed recruiter subclass. Although it seems unlikely at this stage, it might be possible for plaintiff to address the concerns raised in the order about the differences in the recruiter subclass by defining the class more narrowly, making other changes in the class definition or proposing another plan

27

for overcoming the problems identified in this opinion.  Therefore, I will give plaintiff one last opportunity to show that class certification is appropriate.  If plaintiff chooses to redefine or limit the proposed recruiter class in some way, he should keep in mind the requirements for numerosity and typicality under Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3).

ORDER

IT IS ORDERED that

1.  Plaintiff Andrew Drake's motion for class certification under Fed. R. Civ. P. 23, dkt. #51, is DENIED.

2.  Plaintiff may have until November 20, 2015, to file a renewed motion for class certification that addresses the concerns related to the recruiter subclass raised in this order.  Defendant may have until December 4, 2015 to file a response.  If plaintiff does not respond by November 20, the case will proceed on plaintiff Drake's individual claims only.

Entered this 29th day of October, 2015.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge