IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANDREW DRAKE,

                                Plaintiff,

              v.

AEROTEK, INC.,

                                Defendant.

OPINION AND ORDER

14-cv-216-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Plaintiff brought this case as a class action, contending in part that he and the other class members who worked as recruiters of employees for defendant Aerotek, Inc.'s client companies had been misclassified as exempt employers and thereby deprived of the pay they had earned for overtime work, in violation of Wisconsin statutes and the Wisconsin Administrative Code. Plaintiff asserted jurisdiction under 28 U.S.C. § 1332(d)(2), alleging that the matter in controversy exceeded $5,000,000, every class member was a citizen of Wisconsin and defendant was a citizen of Maryland.

Plaintiff's motion for class certification was denied in an order entered on October 29, 2015, but he was given an opportunity to renew his motion and respond to the concerns raised in the October 29 order. Dkt. #126. Before doing that, he reached an agreement with defendant to stay any briefing on the issue of class certification action until the court could rule on defendant's motion for summary judgment.

1

I conclude that defendant is entitled to judgment in its favor on the misclassification issue. Plaintiff's testimony at his deposition made it clear that once he finished his recruiter training course, he performed work as a recruiter that is considered administrative under Wisconsin's overtime requirements. Wis. Admin. Code § DWD 274.04 (the Wisconsin Payment and Collection Law). According to the state regulation, its requirements are to be interpreted similarly to the corresponding provision in the federal Fair Labor Standards Act, 29 U.S.C. § 213(1).

For the purpose of deciding defendant's motion, I find that the following facts are undisputed. I have ignored any fact plaintiff proposed in his October 5, 2015 declaration, dkt. #118, that contradicts his previous sworn deposition testimony. Dkt. #59. Amadio v. Ford Motor Co., 238 F.3d 919, 926 (7th Cir. 2001) ("It is by now well-settled that a party may not attempt to survive a motion for summary judgment by manufacturing a factual dispute through the submission of an affidavit that contradicts prior deposition testimony."). Plaintiff answered the questions put to him at his deposition readily and in detail; he did not indicate confusion about the meaning of any question that would have led him to answer incorrectly; and he described his work in impressive detail. His answers at his deposition differ considerably from the later statements he made in his declaration, but he has provided no explanation for the differences.

This is not a situation in which it is clear that plaintiff's answers at his deposition were mistaken, perhaps because he was asked a question in a confusing manner or he had a lapse of memory. Id. Reading both documents leaves the definite impression that plaintiff was

trying to use his declaration to undermine the testimony he had given at his deposition; both versions of his job duties cannot be true.   This conclusion is reinforced by a reading of the résumé he prepared, in which he emphasized the breadth and scope of his responsibilities in his work for defendant.  Dkt. #89, exh. 1.

## UNDISPUTED FACTS

### A. Defendant Aerotek, Inc.

Defendant Aerotek, Inc. is an international staffing company providing technical, professional and industrial recruiting and staffing services to customers throughout the United States, Canada and Europe.   Plaintiff Andrew Drake is a former recruiter for defendant who worked in defendant's office in Madison, Wisconsin.   In Wisconsin, defendant has six specialized divisions, each of which focuses on recruiting, placing and managing specialized personnel for a particular industry.   Contractor placements are defendant's primary source of income.

Recruiters handle critical parts of the hiring process, including recruiting, screening, evaluating, interviewing, selecting, reference checking and negotiating of wage rates and other terms of employment.  In addition, they counsel, discipline and terminate contractors and handle grievances and other concerns of the contractors.   A recruiter's ability to find contractors who are a good fit for the client is critical to the client's business operations and to defendant's ability to maintain good business relationships with their clients.

B. <u>Plaintiff's Work for Defendant</u>

On beginning work with defendant, plaintiff spent 13 weeks in a training program to become a recruiter, becoming familiar with the fundamentals of the recruiting process, defendant's systems, the clients and their businesses and the types of positions and skills involved in the division in which he would be working.  While he was in training, plaintiff and other trainees were classified as non-exempt employees.  The goal of the training is to prepare the trainees to work independently as recruiters by the time the training ends.

Trainees must demonstrate proficiency in areas of responsibility in order to become recruiters.  Plaintiff was deemed proficient and was promoted to recruiter.  It was his belief that his training had made him far more skilled, allowed him to master more job duties and made him more proficient in his job.  Plt.'s dep., dkt. #59, at 65, 157-158 and 165.

Plaintiff worked as a recruiter in defendant's Contract Engineering division, which is considered a "technical" division.  Employees in that division recruit and place engineering professionals in a variety of engineering positions, including mechanical engineering, automation engineering and drafting.

A recruiter's job is to find candidates who have the skill set, degree, positive attitude and ability to get along with people that the client wants.  Plt.'s dep., dkt. #59, at 24. Finding such candidates involves many discretionary judgment calls.  <u>Id.</u> at 32, 146, 152, 153, 162, 169.  Plaintiff made many such "judgment calls" during in-person interviews and used the in-house interview to find a "perfect fit" for a client by going beyond the candidate's written qualifications and looking at his or her "subjective skill set and behavioral set and

4

whatever else." <u>Id</u>., dkt. #59, at 162.  Plaintiff decided who would continue in the hiring process, made recommendations on the best candidates (and had his recommendations followed 75% of the time) and negotiated pay rates with contractors.  <u>Id</u>. at 85, 25-29, 89-91, 146.  (The recruiting process in the Contract Engineering division tends to be slow because recruiters need considerable time and resources to find qualified candidates.)

It was part of plaintiff's job to know as much as possible about what was going on in the client's office so that if he encountered a good candidate for a different job, he could recommend the candidate to another one of defendant's account managers or recruiters or try to place the person himself.  <u>Id</u>. at 15-16.  Plaintiff began his searches by developing a "sourcing strategy" for finding potential candidates for a particular client, <u>id</u>. at 67-72, taking into consideration the technical and educational requirements for the position and the candidates' previous experience in the industry.  In his searches, plaintiff used a recruiter workspace known as RWS that includes millions of résumés, as well as a "pipeline" within RWS that listed "hot candidates," and his own "stable" or "network" of people he had talked to previously.  <u>Id</u>. at 68-72.  He also used the website LinkedIn.  <u>Id</u>.  Plaintiff used Boolean searches to find persons with specific qualifications.  <u>Id</u>. at 71.

Once plaintiff found likely prospects, he made an initial telephone to them, asking about their current employment and job duties, technical abilities, where they lived, their backgrounds, their work interests and their job and salary requirements.  <u>Id</u>. at 73, 83 and 85.  During these initial calls, plaintiff evaluated the prospective employees' "soft skills," such as their verbal manners and their communication skills.  <u>Id</u>. at 75.  Plaintiff made the decision

5

to invite certain candidates for an in-person interview, at which he could evaluate the candidate's professionalism, appearance, commitment, communication skills, work ethic and preparation.  Id. at 79, 85 and 107-110.  He eliminated from consideration persons who seemed unprofessional.  Id. at 110.  In some instances, however, he would try to work with the candidate to overcome the deficiencies he had noted.  Id. at 32-33 and 151-52.  If there were gaps in the candidate's employment, plaintiff would decide whether they would disqualify the candidate from consideration.  Id. at 32.  Plaintiff made similar judgment calls in finding the candidates he selected to the specific job for which he was recruiting.  Id. at 32-33.  He tried to find candidates who would fit the client's culture.  Id. at 149.

One of plaintiff's core duties was negotiating the pay rate at which he would submit the candidate to the client.  Id. at 90-91.  Although the final rate was subject to the approval of plaintiff's account manager, it was plaintiff's responsibility to decide the proper balance between fitting the rate within the client's pay range and satisfying the candidate.  Id. at 135-137, 164 and 213–14.  It was to plaintiff's advantage to negotiate a rate of pay near the low end of the pay range for the job; doing so increased the profitability of the placement to both plaintiff and his employer.  Id. at 24, 26, 28, 90, 135.  If, however, a particularly strong candidate wanted more money than the client was willing to pay, plaintiff might suggest to his account manager that he talk to the client about raising the pay.  Id. at 133-134, 140.  Plaintiff also negotiated other terms of employment, such as the candidate's willingness to travel for certain assignments.  Id. at 110-11.

6

Once plaintiff had conducted the in-person interviews, he would select the candidate or candidates he thought were best for a particular position and then recommend his selection to his account manager.  Id. at 80.  About 75% of the time, the manager accepted plaintiff's recommendations and passed them on to the client without conducting a separate interview of his own.  Id. at 146, 147.

Once the account manager had approved plaintiff's recommendation, plaintiff began preparing candidates for job interviews.  Id. at 88, 112.  He would advise them on what to wear to the interview, what questions were likely to be asked and how to answer questions.  He might even conduct mock interviews.  Id. at 88.  After a job interview with a client, plaintiff would follow up with his candidate to see how the interview had gone.  Id. at 93.  If the candidate was turned down, plaintiff would pass on to the candidate the client's decision and its reasoning and consider whether the candidate would be a good fit for other positions.  Id. at 132.

If clients had problems with former candidates, who were now "contractors," after they were hired, the client turned to plaintiff to work with the contractor.  Id. at 121-22, 171, 174.  Plaintiff either worked with the contractor if he thought he could handle the problem or turned it over to his account manager.  Id.  Plaintiff kept in regular contact with the contractors he had placed, discussed with them problems they might be having with the client and tried to resolve the problems.  Id. at 114, 121-22.  He acted as a human resources adviser, counseling contractors on appropriate workplace behavior and client preferences.  Id. at 123-24, 171-72, 173, 174.  For instance, if the client had complained about the

7

contractor's tardiness, he might talk to the contractor about the need to be on time for work. Id. at 116-17.

If plaintiff or any other recruiter thought a particular candidate would reflect poorly upon defendant or damage its relationship with the client, he or she had the authority to put a note to that effect in the RWS system not to use that contractor again. Id. at 97, 98. Generally, as a recruiter, plaintiff had responsibility for most contractor-related issues and his account manager had responsibility for anything related to the client. Id. at 92, 219. Recruiters also handled more serious disciplinary matters, depending on their account managers' preferences or their own seniority. Id. at 117-18. Plaintiff handled complaints and concerns raised by contractors about the companies with which they were placed. Id. at 171-72. He was the first-line responder for any given problem, although his account manager might get involved at some point. Id. at 178. It was up to plaintiff to decide whether to involve his account manager. Id. at 173, 174.

Plaintiff worked with his account manager to cultivate relationships with clients, work on business development and attend sales meetings. Id. at 217-17, 221-24. When his account manager was out of the office, plaintiff handled the manager's accounts and performed some of the manager's duties. Id. at 227-30. After plaintiff left defendant's employ, he prepared a résumé, setting out the duties he had performed for defendant, as follows:

- Evaluate[d] candidate's strengths through screening & interviewing.

- [M]atched candidates to clients.

8

- Recruited on behalf of many Fortune 500 companies for senior level engineering roles.

- Work[ed] with Account Managers to identify key market segments, top accounts while developing and maintaining relationships to improve customer service, gain industry knowledge, referrals and leads.

- [I]dentif[ied] top accounts while developing and maintaining relationships to improve customer service, gain industry knowledge, referrals and leads, which was a step toward becoming an Account Manager.

- Mentored and trained new recruiters.

Lincoln Bisbee decl., dkt. #89, exh. 1.

As a recruiter, plaintiff earned considerably more than $700 a month.  Christopher Weiss decl., dkt. #78, exh. 1.  In addition to his salary, he received commissions based on the weekly spread between the contractor's salary and the client's payment to defendant.  Id.


C. Plaintiff's Complaint to the Wisconsin Department of Workforce Development

In June 2013, plaintiff filed an administrative complaint with the Wisconsin Department of Workforce Development, alleging that defendant had misclassified him as an exempt employee and claiming that he should have been paid overtime for his recruiting work.  DWD Initial Determ., dkt. #58-14.  A department investigator accepted written position statements from both parties and rendered an initial determination that plaintiff did not meet the test for an administrative exemption under the Wisconsin regulations.  Darati Doddanna decl., dkt. #67, ¶ 10.  The determination was based solely on the parties' written statement.  Dkt. #58-14.  The investigator did not hold a hearing, so no discovery was undertaken, no testimony was received and the parties had no opportunity to engage in cross-

9

examination.  <u>Id</u>.  The investigator found that plaintiff was not entitled to any relief because he could not prove he had worked more than 40 hours in any work week.  Having made this determination, she closed her investigation.  Dkt. #58-14.  Both parties appealed the preliminary determination but plaintiff withdrew his administrative complaint before the review could be held.  Dkt. #67.

Plaintiff admitted during the briefing for class certification that he was properly certified by defendant as exempt under the Fair Labor Standards Act.  Dkt. #92 at 20-21: "Given the scope of the interpretation of the federal exemption, [plaintiff] concedes that *every* variation of recruiter duties would render recruiters administratively exempt under the FLSA."

OPINION

The issue with respect to the recruiter claim in this case is straightforward: was plaintiff exempt from the Wisconsin Wage and Collection Law while he was working as a recruiter for defendant?  Defendant does not deny that he was a nonexempt employee during his 13 weeks of training, but contends that once he finished the training and took on the full responsibilities of a recruiter, he was exempt under Wisconsin law.

Wisconsin law exempts from overtime requirements many different kinds of employees.  The relevant provisions are found in Wis. Admin. Code § DWD 274.04(1), which sets out the requirements for administrative or professional work.  An exempt administrative employee is

> an employee employed in a bona fide administrative capacity who meets the following criteria:

10

1. Whose primary duty consists of the performance of office or nonmanual work directly related to management policies or general business operations of their employer or their employer's customers, or

2. Who customarily and regularly exercises discretion and independent judgment; and

3. a. Who regularly and directly assists a proprietor, or an employee employed in a bona fide executive or administrative capacity; or

b. Who performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge, or

c. Who executes under only general supervision special assignments and tasks; and

4. Who does not devote more than 20%, or in the case of an employee of a retail or service establishment who does not devote more than 40%, of their hours worked in the workweek to activities which are not directly and closely related to the performance of the work described in subds. 1. through 3.; and

5. Who is compensated for their services on a salary or fee basis at a rate of not less than $700 per month.

§ DWD 274.04(1)(b).

The introductory paragraph to Wis. Admin. Code § DWD 274.04 provides that the exemptions provided in the regulation are to be "interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations, as amended, relating to the application of that act to all issues of overtime" with respect to the types of employees listed in the regulation.

In briefing his motion for class certification, plaintiff admitted that his duties as a recruiter made him exempt under the Fair Labor Standards Act's administrative exemption. Dkt. #92 at 21. He argues now, however, that this admission does not affect his exemption

under the Wisconsin Payment and Collection Law because the 2004 amendments to the FLSA created substantive differences between the federal and state laws. The argument does not stand up to scrutiny. Not only does the state regulation specify that the exemptions are to be "interpreted in such a manner as to be consistent with the Federal Fair Labor Standards Act and the Code of Federal Regulations," but the Court of Appeals for the Seventh Circuit has held that the 2004 amendments did nothing more than streamline the existing regulations by adopting a single standards duties test for each exemption category. Roe-Midgett v. CC Services, Inc., 512 F.3d 865, 870-71 (7th Cir. 2008) (new "general rule" in 2004 exemptions "merely restates the short test's two 'duties' requirements"). Moreover, the language in the "new rule" (29 C.F.R. § 541.24) tracks the language in the old rule and in the Wisconsin administrative exemption: the employee's primary duties must (1) relate directly "to management policies or general business operations of the employer or the employer's customers" and (2) "include[] work requiring the exercise of discretion and independent judgment."

Plaintiff's work as a recruiter comes within Wis. Admin. Code § DWD 274.04(1)(b). When he worked for defendant, his primary duties consisted of office or nonmanual work related to the general business operations of defendant and its customers, thereby satisfying section (1). His recruiting and hiring of new employees related directly to the business operations of either defendant or its customers; indeed, it was the core of defendant's business. He described in his deposition how his work required him to exercise discretion and independent judgment on a regular and customary basis. He was searching for suitable

applicants, regularly assessing them for their suitability for particular kinds of jobs and particular clients, preparing them for interviews, recommending them for jobs, stepping in to avert or resolve conflicts between contractors and clients, or following up with contractors.

A number of courts have found that work similar to the work plaintiff performed for defendant was exempt under the corresponding provision in the FLSA. E.g., Andrade v. Aerotek, Inc., 700 F. Supp. 2d 738, 444-48 (D. Md. 2010) (employee who identified and recommended professionals to her account manager to fill contract positions with Aerotek's clients, using a variety of tools to find qualified persons, along with personal interviews to assess candidate's personality, and who negotiated pay or recommended to her manager that the client increase its pay offer, prepared candidates for job interviews with clients, managed the candidates after they were hired and whose supervisor approved roughly 75% of her recommendations was exempt administrative employee under FLSA). See also Quintiliani v. Concentric Healthcare Solutions, LLC, 944 F. Supp. 2d 738, 742 (D. Ariz. 2012) (staffing coordinators at firm specializing in providing temporary or fill-in healthcare professionals to hospitals and clinics exempt from FLSA; coordinators matched medical professionals to clients' needs, responded to discipline problems associated with staff and promoted, serviced and administered general business operation); Hudkins v. Maxim Healthcare Services, Inc., 39 F. Supp. 2d 1349, 350 (M.D. Fla. 1998) (defendant carried burden of showing that its recruiters were exempt from FLSA because they exercised independent judgment and discretion in placing nurses with defendant's clients, approving higher rates of pay for nurses

when necessary, counseling and disciplining nurses who did not provide good service to defendant's clients and participating in termination of nurses who could not meet standards).

The close similarity between the provisions in the Wisconsin Payment and Collection Law and those in the FLSA and the Code of Federal Regulations refute any claim by plaintiff that the state law should be interpreted differently from the federal law. Despite the case law and the statement in the Wisconsin regulations that the exemptions in that law are to be interpreted so as to be consistent with the Fair Labor Standards Act, he continues to argue that the Wisconsin law should not be interpreted as a carbon copy of the FSLA. His only support for that argument consists of summaries of several low-level administrative decisions made by employees of the state's Department of Workforce Development. It is not possible to tell from the summaries whether the decisions were litigated or are simply the decisions of single investigators, or whether the facts in the summarized cases bear any resemblance to those in plaintiff's case. Accordingly, I am not giving any weight to the summaries or to the department's interpretation of the regulation as it relates to the summarized fact situations.

The undisputed facts show that plaintiff performed work related directly to the management or general business activities of defendant and its customers, that he exercised discretion and independent judgment customarily and regularly on matters of significance for defendant and its customers and that he provided direct assistance to his account manager and performed his specialized recruiter duties under the account manager's general supervision. He spent more than 80% of his time on activities directly and closely related to the performance of his work duties. (Even if some of this time was devoted to routine work such

14

as reviewing résumés, that work was related directly and closely to the exempt work and therefore qualifies as exempt.)   Finally, plaintiff was paid considerably more than the statutorily required $700 a month.

The undisputed evidence and plaintiff's statements in the résumé he prepared after leaving defendant show that defendant classified him properly as an administrative employee under both the Fair Labor Standards Act, 29 U.S.C. § 213(1), and the Wisconsin Payment and Collection Law, Wis. Admin. Code ch. 274.04.   Accordingly, defendant's motion for summary judgment with respect to plaintiff's recruiter claim will be granted.   It follows from the granting of defendant's motion for summary judgment that plaintiff Andrew Drake cannot represent a class of similarly situated recruiters.

The only claim remaining in this case is plaintiff's individual claim that defendant failed to pay him for overtime he worked as a recruiter trainee each week between March 21, 2012 and March 31, 2014.   Because it is not clear whether plaintiff will seek to pursue this claim, I will give him until January 25, 2016, in which to advise the court whether any further proceedings are necessary.


ORDER

IT IS ORDERED that defendant Aerotek, Inc.'s motion for summary judgment, dkt. #96, is GRANTED.   Plaintiff Andrew Drake may have until January 25, 2016, in which to

advise the court whether any further proceedings are necessary concerning his individual claim

for overtime for his work as a recruiter trainee.

      Entered this 7th day of January, 2016.

                                              BY THE COURT:
                                              /s/
                                              BARBARA B. CRABB
                                              District Judge